IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| KIMBERLY JO KINSER, | § | Case No. 23-40635 |
| | § | (Chapter 13) |
| Debtor. | § | |
| | § | |
| | § | |
| NASHAUD PRASLA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. Proc. No. 23-4060 |
| | § | |
| KIMBERLY JO KINSER, KINSER LAW, | § | |
| PLLC, and KINSER & ESQUINAZI, PLLC, | § | |
| | § | |
| Defendants. | § | |

## FINDINGS OF FACT AND CONCLUSION OF LAW

This adversary proceeding arises out of a demand by Prasla Nash (the "**Plaintiff**" or "**Prasla**") for a return of $5,000 he paid to Kimberly Jo Kinser (the "**Debtor**" or "**Kinser**") for immigration legal services. Prasla seeks a nondischargeable judgment against the Kinser based on claims of false pretenses, false representations, and actual fraud under 11 U.S.C. § 523(a)(2)(A), and fraud or defalcation while acting in a fiduciary capacity under 11 U.S.C. § 523(a)(4). The Court tried the Plaintiff's complaint on July 14-18, 2025, and received written closing arguments on August 8, 2025.

Having considered the credible evidence presented at trial, and the parties' arguments, the Court makes the following findings of fact and conclusions of law. These findings and conclusions constitute the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, made applicable to adversary proceedings by Federal Rule of

Bankruptcy Procedure 7052. Where appropriate, findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact.

## I.   FINDINGS OF FACT

1. At all material times, Kinser was a lawyer licensed in the District of Columbia who maintained a private immigration practice in the Dallas-Fort Worth metroplex.

2. In April 2011, Prasla and his wife, both U.S. citizens, adopted a girl named Afzaa from India through a Tarrant County adoption proceeding.

3. In December 2012, Prasla filed a Form I-130 "Petition for Alien Relative" with the U.S. Citizenship & Immigration Services ("**USCIS**") on behalf of Afzaa without the assistance of counsel. The Form I-130 was approved on or about October 26, 2013.

4. In November 2013, Prasla filed Afzaa's Form I-485 "Application to Register Permanent Residence or Adjust Status," also without the aid of a lawyer.

5. Prasla also sought to adopt Afzaa's younger brother, Faiz, whose adoption was pending in Tarrant County with a final hearing scheduled for June 30, 2014.

6. Because Prasla owned and operated a business that required him to be out of the country for extended periods of time, Prasla decided to hire an immigration lawyer to monitor and respond to immigration matters for Afzaa and Faiz during his absences.

7. Prasla first became familiar with Kinser through her radio show.

8. In June 2014, Prasla contacted Kinser through her website to inquire about retaining her for immigration matters involving both children.

9. Prasla met with Kinser in person at her office on June 19, 2014.

10. At that meeting, Kinser recommended filing a Form I-765 "Application for Employment Authorization" for Afzaa. Prasla agreed. Kinser and Prasla also agreed that Kinser

would file a notice of appearance (Form G-28) with USCIS as counsel on Afzaa's pending Form I-485.

11. Prasla and Kinser also discussed Faiz's pending adoption case and the two-year waiting period for filing for immigration benefits for Faiz. Faiz would not be eligible to file an application for immigration benefits until October 2015 (after two years of legal custody and joint residence with his adoptive parents).

12. Prasla wrote a check payable to "Kinser & Esquenazi Law" for $5,750 and delivered it to Kinser at the meeting. Of that amount, $750 was for the preparation of the Form I-765 and the paperwork to become attorney of record for Afzaa's Form I-485, which had not yet been approved.

13. The remaining $5,000 was to be used for fixed fees for work to be done for Faiz in the future, totaling $3,000, and for USCIS filing fees in connection with an application for immigration benefits, which Kinser estimated would be $2,000.

14. Kinser and Prasla did not sign a written engagement agreement.

15. However, Kinser created a four-page intake form during the meeting. The third and fourth pages of the intake form reflected the flat fees that Kinser would charge Prasla for various actions.

16. Kinser deposited the entire $5,750 check into her operating account. She did not hold any portion in trust.

17. On Saturday, July 19, 2014, Prasla received a "Notice of Intent to Revoke" ("**NOIR**") the approval of Afzaa's I-130 "Petition for Alien Relative" from the USCIS. The NOIR was an unexpected development that raised different legal issues than those Prasla had discussed with Kinser at the June meeting.

18. On July 19, 2014, Prasla sent an email to Kinser about the NOIR, stating he would like her assistance "if you are convinced and you have sufficient knowledge and experience to navigate through this matter."

19. On Sunday, July 20, 2014, Prasla emailed Kinser a copy of the NOIR and a link to some relevant materials. Prasla and Kinser exchanged emails to schedule a telephonic conference for Wednesday, July 23, 2014. Prasla did not request that Kinser take any action on the NOIR.

20. On July 31, 2014, Prasla retained separate counsel, Cyrus Mehta, to respond to the NOIR. Kinser was aware that Prasla had hired another attorney.

21. Between September and December 2014, Kinser's office received and forwarded to Prasla two documents from the USCIS related to the NOIR. Prasla responded and confirmed that he had hired another attorney to respond to the NOIR and that the USCIS had sent copies to Kinser's office in error.

22. On January 28, 2016, Prasla sent Kinser a letter asking her to refund the $5,000 retainer he had paid in June 2014 for her to eventually represent Faiz in connection with his immigration proceedings. He explained that he had decided not to go forward with an application for immigration benefits for Faiz.

23. Kinser responded by letter dated February 11, 2016, claiming that an engagement agreement had been hand-delivered to Prasla at their initial meeting on June 19, 2014, and suggesting he may have misplaced it. Her letter attached a purported engagement agreement, invoices, a statement of account dated December 31, 2014, and a check for $1,059.90.

24. Kinser created the engagement agreement, invoices, and statement of account after she received Prasla's refund request in January 2016.

4

25.     Kinser did not provide Prasla with an engagement agreement during or after the June 19, 2014 meeting. Prasla never signed one. Kinser never sent any invoices to Afzaa or Prasla for work purportedly performed after that meeting.

26.     Kinser's testimony to the contrary was not credible.

27.     In the backdated engagement agreement Kinser created in February 2016, Kinser described her retention as covering the "Letter of Engagement for daughter's Form I-765, Application for Employment Authorization. Filing G-28 on daughter's pending I-485, and deposit for future legal fees for son's case." In the body of the back-dated engagement letter, she stated that she would perform work to be paid by Prasla at the hourly rate of $250 (or $300 after hours or on the weekend).

28.     After receiving Prasla's request for a refund, Kinser also created invoices backdated to 2014. Each of the invoices was directed to Afzaa Prasla and misspelled her address as located in "SouthIKE, tz." The invoices contained block billing and did not disclose the applicable hourly rate.

29.     The invoices totaled $4,690 and purported to cover: (1) the June 19 initial meeting; (2) preparation of the I-765 and G-28; and (3) extensive legal research, and (4) correspondence on Afzaa's NOIR from July 19 through December 2014.

| Date | Description | Amount |
|---|---|---|
| 6/19/2014 | Meet w/Nash Prasla; Prep. Afzaa's Forms G-28 and I-765 | $250 |
| 7/1/2014 (Tues.) | Attorney Fee – Prep & Mail Afzaa's Form I-765 ($250); Postage and Delivery Costs – USPS Priority Mail ($5.05) | $255.05 |
| 7/1/2014 (Tues) | Attorney Fee – Prep & Send Afzaa's Form G-28 w/ Cover Letter to Dallas Field Office ($250)/ Postage and Delivery Costs – USPS Priority Mail ($5.05) | $255.05 |
| 7/19/2014 (Sat.) | Attorney Fee – Receive and Review Extensive Email from Nash Prasla re: I-130 Notice of Intent to Revoke; Review USCIS PM; Review File; Perform Legal Research on Hague Convention & Habitual Residence; Prep. & Send | $900 |

| | Email to Nash Prasla | |
|---|---|---|
| 7/20/2014 (Sun.) | Attorney Fee – Receive & Review E-mail from Nash Prasla; Review File; Review Afzaa's I-130 Notice of Intent to Revoke; Perform Legal Research | $600 |
| 7/21/2014 (Mon.) | Attorney Fee – Review File; Receive and Review E-mails from Nash Prasla; Review Afzaa's I-130 Notice of Intent to Revoke; Perform Legal Research; Prep. & Send E-mails to Nash Prasla | $625 |
| 7/22/2014 (Tues.) | Attorney Fee – Review File; Review USCIS PM; Perform Legal Research; Prep. & Send E-mail to Nash Prasla; Receive & Review E-mail from Nash Prasla | $500 |
| 7/23/2014 (Wed.) | Attorney Fee – Phone Conf/ w/Nash Prasla; Review File & USCIS PM; Perform Legal Research; Review Forms I-600 & I-800; Prep. & Send E-mail to Nash Prasla | $750 |
| 7/24/2014 (Thurs.) | Attorney Fee – Receive & Review E-mail from Nash Prasla; Review Form I-800 | $62.50 |
| 9/22/2014 (Mon.) | Attorney Fee – Review File; Prep & Send E-Mail to Nash Prasla | $62.50 |
| 11/26/2014 (Sun.) | Attorney Fee – Receive & Review Afzaa's I-130 Decision Notice from USCIS; Scan & Email Decision Notice to Nash Prasla; Review File | $375 |
| 11/29/2014 (Sat.) | Attorney Fee – Prep. & Send E-mail to Nash Prasla | $30 |
| 12/1/2014 (Mon.) | Attorney Fee – Receive & Review E-Mail from Nash Prasla | $25 |
| | TOTAL | $4,690 |

30.     Prasla did not negotiate the $1,059.50 check.

31.     In an email sent to Kinser on February 14, 2016, Prasla challenged the authenticity of the engagement agreement and other documents. He also stated: "I am a type of person that [does] not take lies and dishonesty very well. Especially when there is a breach of trust. I will spend $50,000 in legal fees to get my $5,000 back from you because of breach of trust and not the money."

32.     Prasla retained the law firm of French & Hamilton, LLC, in February 2018.

33.     Prasla filed a lawsuit in Dallas County Court on February 12, 2018. In response, Kinser asserted counterclaims, including defamation. The state court dismissed Kinser's claims

6

under the Texas Citizens Participation Act (the "**TCPA**" or "**Anti-SLAPP**" Act), awarding Prasla

$39,500 in attorney fees and $1,000 in statutory damages.

34.   During the state court action, the state court sanctioned Kinser for discovery

abuse on three separate occasions, awarding a total of $34,017.50 in additional attorney fees and

entering deemed findings that (1) the engagement agreement was created by Kinser in February

2016 and backdated to June 19, 2014, and (2) all invoices and statements were created in

February 2016 and backdated to  2014 – all after Prasla's refund demand.

35.   Prasla retained forensic expert Mr. Todd J. Cooper to examine Kinser's devices

for relevant information. Mr. Cooper testified, credibly, at trial.

36.   Mr. Cooper examined data collected from Kinser's laptop and office server in

March 2023, identifying several files of interest: (1) a letter of engagement, (2) two drafts of a

refund cover letter, and (3) a compiled PDF file that contained a copy of an engagement letter

signed by Kinser, a statement of account, 13 invoices, and a copy of a check from Kinser Law,

PLLC to Prasla for $1,069.90 dated February 10, 2016.

37.   Prasla's suit against Kinser was set for jury trial on May 19, 2023. Kinser filed her

bankruptcy petition on April 11, 2023, the date her deposition was scheduled.

38.   Prasla filed an unsecured proof of claim in Kinser's bankruptcy case for the

$5,000 retainer, the state court sanctions, and his additional attorney fees. Prasla also filed this

adversary proceeding seeking to establish that Kinser defrauded him and breached her fiduciary

duties to him, among other things, and seeking to have Kinser's obligations to him declared

nondischargeable.

39.     Kinser objected to the allowance of Prasla's claim in her bankruptcy case. The parties entered into an agreed order that the amount of the claim would be determined in this adversary proceeding.

40.     After the close of discovery, Kinser only disclosed the first two pages of an intake form she had created when initially meeting Prasla.

41.     Mr. Cooper's forensic review located the complete, four-page version of the intake form, which contained handwritten notations on the final two pages reading "daughter's case $450, son's case, "$2500 + $500 interview fee, $1,490 gov + fees."

42.     At trial, Prasla's counsel submitted invoices for legal services beginning on February 9, 2018, which is when they were retained, through March 2023, which is the last full month before Kinser's bankruptcy petition. The total pre-petition fees charged in the invoices, less expenses, is $122,740. Of that total, the amount of $73,517.50 was previously awarded to Prasla in the three orders from the state court sanctioning Kinser.

## II.     CONCLUSIONS OF LAW

### A.  Jurisdiction, Authority, and Burden

1.     This Court has jurisdiction under 28 U.S.C. §§ 1334 and 157 and the authority to enter a final judgment because this adversary proceeding constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (I), and meets all constitutional standards for proper exercise of full judicial power by this Court.

2.     Dischargeability under the Bankruptcy Code is a question of federal law, though state law informs that determination. *Gupta v. Eastern Idaho Tumor Institute, Inc. (In re Gupta)*, 394 F.3d 347, 350 (5th Cir. 2004). Exceptions to discharge under 11 U.S.C. § 523 must be strictly construed in favor of a debtor so that the debtor may be afforded a fresh start."

*Hudson v. Raggio (Matter of Hudson)*, 107 F.3d 355, 356 (5th Cir. 1997). The plaintiff bears the burden of proof by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 286 (1991).

### B. Proof of Claim and Burden Shifting

3.     In the underlying bankruptcy case, Kinser objected to the allowance of Prasla's claim. The parties thereafter entered into an agreed order providing that the amount and validity of the claim would be determined in this adversary proceeding. Accordingly, the Court determines both the existence and the amount of the debt based upon the trial record.

4.     Under 11 U.S.C. § 502(a) and Federal Rule of Bankruptcy Procedure 3001(f), a properly filed proof of claim constitutes prima facie evidence of the validity and amount of the claim. Even assuming arguendo that certain components of the proof of claim do not enjoy prima facie evidentiary status under Rule 3001, the evidence presented at trial independently establishes the validity and amount of the claim by a preponderance of the evidence. The Court therefore resolves the claim objection on the merits and does not rely solely upon any presumption arising from the proof of claim.

### C. Finality and Effect of State Court Orders

5.     In her closing arguments, Kinser argues that the three state court sanctions orders are interlocutory and therefore lack preclusive effect. The Court need not decide whether those orders would satisfy finality standards for purposes of res judicata or collateral estoppel. This Court is not applying claim or issue preclusion. Rather, the Court is independently determining the existence and amount of the debt based upon the evidentiary record presented at trial.

6.     The sanctions awards represent fixed monetary obligations imposed by a court of competent jurisdiction. A "debt" under the Bankruptcy Code is simply "liability on a claim." 11

9

U.S.C. § 101(12). The sanctions awards constitute enforceable monetary liabilities regardless of whether the underlying state court action had proceeded to final judgment at the time of the bankruptcy filing.

7.     Moreover, the conduct giving rise to those sanctions—fabrication of documents, discovery abuse, and baseless counterclaims—was proven again in this Court. Thus, even absent reliance on the state court's orders, the Court independently finds that those monetary obligations constitute valid debts under applicable non-bankruptcy law.

## D.  Existence of a Debt Under Non-Bankruptcy Law and Liquidation of Claim

8.     At trial, Prasla announced that he was seeking to establish four state law claims against Kinser: (1) common law fraud; (2) breach of fiduciary duty; (3) violations of the Texas Deceptive Trade Practices Act [specifically, TEX. BUS. COM. CODE §§ 17.46(a), (b)(12), (b)(24)]; and (4) violations of the Texas Fair Debt Collections Act [specifically, TEX. FIN. CODE §§ 392.308(a)(8), (14), and (19)]. He also asserts a conversion claim. The Court will address each in turn.

### 1.  Common Law Fraud

9.     Common law fraud in Texas requires a material representation that was false, and was either known to be false when made or was asserted without knowledge of its truth, that was intended to be acted upon, that was acted upon, and that caused injury. *Trenholm v. Ratcliff,* 646 S.W.2d 927, 930 (Tex. 1983); *Stone v. Lawyers Title Ins. Corp.,* 554 S.W.2d 183, 185 (Tex. 1977). Where a duty of disclosure exists, deliberate suppression of material facts constitutes fraud. *Kahlig v. Boyd*, 980 S.W.2d 685, 688–89 (Tex. App. 1998) (citing *Wilson v. Jones,* 45 S.W.2d 572, 574 (Tex. Comm'n App.1932, holding approved)).

10.     Kinser argues that this case represents nothing more than a billing dispute. The Court rejects that characterization. The evidence here goes far beyond a dispute over the terms of a fee agreement or billing methodology. Prasla has established each of the elements of common law fraud.

11.     At the June 19, 2014 meeting, Kinser represented that the $5,000 portion of Prasla's payment would be held and applied toward future flat-fee legal services and government filing fees for Faiz's immigration case. Those representations were false. Kinser immediately deposited the funds into her operating account, did not segregate or hold them in trust, and never performed any work on Faiz's case.

12.     Kinser knew the representations were false. She aware that Faiz was ineligible for immigration benefits at the time of payment, that the contemplated work might never materialize, and that she had no intention of preserving the funds for their stated purpose, as confirmed by her failure to provide a written engagement agreement, her failure to issue contemporaneous invoices for work she claims to have performed, and her subsequent fabrication of backdated documents. Prasla justifiably relied on these representations, given Kinser's status as a licensed attorney holding herself out as an immigration specialist, and suffered direct injury in the loss of the $5,000, the attorney fees required to pursue recovery, and the costs imposed by Kinser's discovery misconduct.

13.     Kinser contends that Prasla relied on his own understanding of immigration fee practices and therefore did not rely upon her representations. The Court finds otherwise. Prasla's prior experience with attorneys does not negate his right to rely upon Kinser's representations concerning the handling of his funds.

## 2. **Breach of Fiduciary Duty**

14.     "Generally, the elements of a claim for breach of fiduciary duty are (1) the existence of a fiduciary duty, (2) breach of the duty, (3) causation, and (4) damages." *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 220 (Tex. 2017).

15.     A fiduciary relationship exists between an attorney and client as a matter of Texas and District of Columbia law. *Willis v. Maverick*, 760 S.W.2d 642, 645 (Tex. 1988); *Griva v. Davison*, 637 A.2d 830, 846–47 (D.C. 1994). Violations of disciplinary rules, while not independently actionable, supply evidence of breach under Texas law. *In re Pace*, 456 B.R. 253, 280–81 (Bankr. W.D. Tex. 2011) ((quoting *Frazin v. Haynes & Boone, LLP (In re Frazin),* 2008 WL 5214036, at \*57 (Bankr. N.D. Tex. Sept. 23, 2008)). Likewise, in the District of Columbia where Kinser is licensed, violations of the disciplinary rules of professional conduct "certainly constitute evidence in an action at common law." *Williams v. Mordkofsky*, 901 F.2d 158, 163 (D.C. Cir. 1990) (citing *Waldman v. Levine,* 544 A.2d 683, 690–91 (D.C. 1988)).

16.     Kinser does not contest the existence of a fiduciary duty. She breached it in two principal respects. First, DC Rule of Professional Conduct 1.15(e) requires that advances on unearned fees be treated as client property, unless the client gives informed consent to a different arrangement, and mandates return of unearned fees upon termination. Kinser deposited unearned funds directly into her operating account without disclosure or consent.[1] Second, when confronted with a refund demand, Kinser fabricated and backdated documents to misrepresent the terms of her engagement and justify retaining funds she had not earned. This conduct—

---

[1] While the DC Rule of Professional Conduct 1.15 does not require written fee agreements unless the attorney is retained on a contingency basis, this litigation exemplifies why it is a best practice to use a fee agreement in every case.

misappropriation of client funds, self-dealing, and deliberate dishonesty—constitutes a clear breach of her fiduciary obligations.

17.     Kinser argues that violations of the District of Columbia Rules of Professional Conduct do not create private civil liability. The Court agrees that disciplinary rules do not independently create a cause of action. However, those rules define the fiduciary standard of care applicable to attorneys. Misappropriation of client funds and failure to segregate unearned fees constitute breaches of fiduciary duty independent of any disciplinary proceeding.

### 3.  **Alternate Grounds: TDTPA, TDCPA, and Conversion**

18.     The Court has found Kinser liable for common law fraud and breach of fiduciary duty, which are sufficient to establish the existence of a debt under Texas law. The Court addresses three additional theories as independent and alternative grounds for liability: the Texas Deceptive Trade Practices Act, the Texas Debt Collection Practices Act, and common law conversion. These alternate theories are significant not merely as redundant bases for recovery, but because the TDTPA and TDCPA provide the statutory foundation for treble damages and mandatory attorney fees, which Prasla has requested.

#### a.  **TDTPA**

19.     First, the elements of a claim under the Texas Deceptive Trade Practices Act ("**TDTPA**") are (1) the plaintiff is a consumer; (2) the defendant engaged in a false, misleading, or deceptive act; (3) the consumer relied on that act to the consumer's detriment; and (4) the act constituted a producing cause of the plaintiff's damages. *See* TEX. BUS. & COM. CODE §§ 17.46, -.50; *Shkolnick v. Coastal Fumigators, Inc.*, 186 S.W.3d 100, 104 (Tex. App.—Houston [1st Dist.] 2005, no pet.). Although attorneys are generally exempt from TDTPA liability for claims "based on the rendering of a professional service, the essence of which is the providing of advice,

13

judgment, opinion, or similar professional skill," that exemption does not apply to "an express misrepresentation of a material fact that cannot be characterized as advice, judgment, or opinion" or to "a failure to disclose information in violation of Section 17.46(b)(24)." TEX. BUS. & COM. CODE § 17.49(c)(1), (2).

20. Section 17.46(b) defines deceptive practices, in pertinent part, as follows:

Except as provided in Subsection (d) of this section, the term "false, misleading, or deceptive acts or practices" includes, but is not limited to, the following acts:

(12) representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law; …

(24) failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed; ….

21. Under the TDTPA, a plaintiff may recover actual damages caused by the defendant's "unconscionable action or course of action." TEX. BUS. & COM. CODE § 17.50(a)(3).[2] And if the defendant's unconscionable conduct is committed knowingly, meaning that it is with "actual awareness, at the time of the act or practice complained of, of the falsity, deception, or unfairness of the act or practice," TEX. BUS. & COM. CODE § 17.45(9), then the plaintiff may recover treble damages of up to three times the amount of his actual damages, *id.* § 17.50(b)(1).

22. In this case, Kinser provided legal services to an individual (Prasla) for personal/family purposes (immigration matters for his children), satisfying the TDTPA's consumer transaction requirement.

---

[2] An "unconscionable action or course of action" is an "act or practice which, to a[n insured's] detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." *Id.* § 17.45(5). The resulting unfairness must be "glaringly noticeable, flagrant, complete[,] and unmitigated." *Bradford v. Vento*, 48 S.W.3d 749, 760 (Tex. 2001) (quoting *Ins. Co. of N. Am. V. Morris*, 981 S.W.2d 667, 677 (Tex. 1998)).

14

23.     Kinser falsely represented to Prasla at their initial meeting on June 19, 2014, that she would represent him on a flat fee basis. Prasla relied on that representation and deposited funds with Kinser in the amount of $5,750.

24.     By falsely representing to Prasla that she intended to represent Afzaa and Faiz on a flat fee basis, and by failing to disclose that she intended to deposit client funds into her operating account rather than hold them in trust, Kinser misrepresented the true the true nature of the services she intended to provide in violation of TDTPA § 17.46(b)(24). In addition, by creating false documentation after Prasla requested a return of the $5,000 relating to Faiz's immigration, Kinser misrepresented the basis and terms of her legal engagement and made false statements about her services in violation of TDTPA § 17.46(b)(12).

25.     The Court, therefore, concludes that Prasla is entitled to treble damages of $15,000.

### b.  TDCPA

26.     Similarly, the elements of a claim under the Texas Debt Collection Practices Act ("**TDCPA**"), which is governed by the Texas Finance Code, *see* TEX. FIN. CODE §§ 392.001 *et seq*., are: (1) the debt is a consumer debt; (2) the defendant is a debt collector, as defined under the TDCPA; (3) the defendant committed a wrongful act in violation of the TDCPA; (4) the wrongful act was committed against the plaintiff; and (5) the plaintiff was injured as a result of the defendant's wrongful act. TEX. FIN. CODE §§ 392.001–392.404; *McDaniel v. JPMorgan Chase Bank, N.A.*, No. 1:12-CV-392, 2012 WL 6114944, at *7 (E.D. Tex. Dec. 10, 2012).

27.     In this case, Kinser misrepresented the character, extent, or amount of a consumer debt, in violation of § 392.304(a)(8), by making improper charges and misstating the amounts

owed.[3] Kinser also falsely represented the status or nature of the services she rendered, in violation of § 392.301(a)(14), by misrepresenting the amount of work for which she billed as well as misrepresenting her right to bill for work relating to Afzaa's NOIR.[4] Finally, Kinser used false representations or deceptive means to collect a debt, in violation of § 392.304(a)(19), by fabricating an engagement letter, misrepresenting her right to bill for Afzaa's NOIR, misrepresenting the amount of work performed, and creating invoices that she did not send to Prasla or Afzaa when the alleged charges were incurred.[5]

### c.  Conversion

28.  Additionally, Prasla has established a claim for conversion under Texas law. The elements of conversion are: (1) the plaintiff owned, had legal possession of, or was entitled to possession of the property; (2) the defendant assumed and exercised dominion and control over the property in an unlawful and unauthorized manner, to the exclusion of and inconsistent with the plaintiff's rights; and (3) the defendant refused the plaintiff's demand for return of the property. *Freezia v. IS Storage Venture, LLC*, 474 S.W.3d 379, 386–87 (Tex. App.—Houston [14th Dist.] 2015, no pet.).

29.  Prasla owned, had legal possession of, or was entitled to possession of the $5,000 at issue. The evidence establishes that $5,000 of the funds paid to Kinser in June 2014 was expressly designated for future legal services and anticipated government filing fees relating to

---

[3] Section 392.304(a)(8) prohibits the use of "fraudulent, deceptive, or misleading representation" by a debt collector, including "misrepresenting the character, extent, or amount of a consumer debt[.]" *See* TEX. FIN. CODE § 392.304(a)(8).

[4] Section 392.304(a)(14) of the Texas Finance Code prohibits a debt collector from "representing falsely the status or nature of the services rendered by the debt collector or the debt collector's business[.]" *See* TEX. FIN. CODE § 392.304(a)(14).

[5] "Section 392.304(a)(19) is a catch-all provision that prohibits a debt collector from using any other false representation or deceptive means to collect a debt." *Williams v. Wells Fargo Bank, N.A.,* 560 Fed.Appx. 233, 240–41, 2014 WL 1044304, at *6 (5th Cir. 2014) (per curiam). "To violate the [Texas Debt Collection Act] using a misrepresentation, 'the debt collector must have made an affirmative statement that was false or misleading.' " *Id.* (quoting *Kruse v. Bank of New York Mellon,* 936 F.Supp.2d 790, 792 (N.D. Tex. 2013)).

Faiz's immigration case. Those services could not legally be performed at the time the funds were paid, and in fact were never performed by Kinser. Accordingly, the $5,000 constituted unearned client funds, to which Prasla retained a superior right of possession until such time as the funds were earned or applied for their stated purpose.

30.     Kinser argues that any conversion was innocent. The Court finds that the fabrication of backdated documents demonstrates intentional dominion inconsistent with Prasla's rights. This was not an innocent mistake but a deliberate exercise of control over client funds.

31.     Kinser assumed and exercised dominion and control over the property in an unlawful and unauthorized manner, to the exclusion of and inconsistent with Prasla's rights. Rather than holding the unearned funds in trust or segregating them for future use, Kinser deposited the entire $5,750 payment into her operating account and treated the funds as her own. She thereafter exercised control over the $5,000 in a manner inconsistent with Prasla's ownership interest by retaining the funds despite performing no work for Faiz and by later attempting to justify her retention of the funds through fabricated, back-dated documents.

32.     Kinser's refusal to return the $5,000 to Prasla was not based on a good-faith dispute, but instead was grounded in fabricated documentation created after the refund demand. Her actions therefore satisfy the intent component inherent in the exercise of unlawful dominion required to establish conversion.

33.     Conversion provides an alternative basis for liability that is legally independent of the fraud and fiduciary duty claims, though it does not alter the damages calculation. The $5,000 that is recoverable as converted property is the same $5,000 at the core of Prasla's fraud and breach of fiduciary duty claims. The Court therefore treats conversion as a cumulative ground establishing Kinser's liability rather than a source of additional or separate recovery.

17

C. **Damages and Attorney Fees**

1. **Actual and Additional Damages**

34. The Court finds that Prasla suffered actual damages as a direct and proximate result of Kinser's conduct and breach of fiduciary duty.

35. First, Prasla is entitled to recover the $5,000 deposit, which was designated for services never performed and wrongfully retained. Prasla is also entitled to treble damages of $15,000. The TDTPA provides that a plaintiff can recover "additional damages" of three times his economic damages because Kinser acted knowingly and intentionally. TEX. BUS. & COM. CODE § 17.50(b)(1).

36. Second, Prasla is entitled to recover the monetary sanctions and statutory awards entered against Kinser in the state court action, consisting of $39,500 and $1,000 under the Anti-SLAPP Act, $16,005 for the first discovery sanction, and $18,012.50 for the second discovery sanction, totaling $74,517.50. These amounts represent fixed monetary liabilities imposed as a consequence of Kinser's litigation misconduct, including the assertion of baseless counterclaims and discovery abuse arising from her fabrication of documents. The Court independently finds that these damages were proximately caused by Kinser's underlying fraud and breach of fiduciary duty.

37. Third, Prasla is entitled to recover his reasonable attorney fees and costs in the amount of $122,740 incurred prior to Kinser's bankruptcy in March 2023. The Texas Deceptive Trade Practices Act provides that a prevailing consumer shall recover reasonable and necessary attorney fees. TEX. BUS. & COM. CODE § 17.50(d). Likewise, under the Texas Debt Collection Practices Act provides that a prevailing plaintiff is entitled to attorney fees reasonably related to the amount of work and costs. TEX. FIN. CODE § 392.403(b).

38.     Under Texas law, the lodestar method governs the determination of reasonable attorney fees. *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469 (Tex. 2019). The Court has reviewed the detailed invoices admitted at trial covering legal services from February 2018 through March 2023. The invoices identify the attorney performing the work, the date of service, the task performed, the time expended; and the hourly rate charged. *See id.* at 498 (discussing the evidence required to establish reasonable attorney fees).

39.     The Court finds that the hourly rates charged are reasonable for commercial and professional-liability litigation in Dallas County during the relevant time. The Court further finds that the total hours expended were reasonable given the scope and complexity of the litigation, which included anti-SLAPP motion practice, multiple discovery disputes, sanctions proceedings, retention and coordination with a forensic computer expert, and the analysis of fabricated engagement documents and invoices.

40.     The litigation expanded significantly due to Kinser's fabrication of documents and subsequent litigation conduct. The Court finds that the volume of work performed was a foreseeable and direct consequence of that conduct. Every significant escalation in this dispute traces directly to Kinser's own wrongdoing. She fabricated an engagement agreement and a set of invoices to defeat a legitimate refund demand. She produced those documents in discovery while concealing the intact four-page intake form that contradicted them. She filed baseless counterclaims that required Prasla to invoke anti-SLAPP protections. And she was sanctioned for discovery abuse on three separate occasions before finally filing for bankruptcy on the eve of her deposition. Each of these acts was a deliberate choice to perpetuate and conceal the original fraud rather than correct it.

19

41.     Multiplying the reasonable hours by the reasonable hourly rates yields a reasonable lodestar. The Court finds that no upward or downward adjustment is warranted.

42.     Kinser argues that attorney fees must be segregated between recoverable and nonrecoverable claims pursuant to *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299 (Tex. 2006). The Court finds that segregation is not required in this case because the recoverable and nonrecoverable claims arise from a common core of operative facts. Kinser's misappropriation of funds and fabrication of documents was at the core of all Prasla's claims, and the legal work performed was inextricably intertwined. The same evidence supported the fraud, fiduciary duty, TDTPA, TDCPA, conversion, and sanctions-related issues. Any portion attributable solely to nonrecoverable theories would be de minimis and would not materially affect the overall lodestar.

43.     Finally, Kinser contends that awarding both the state court sanctions and the full amount of attorney fees would result in double recovery. The Court has carefully reviewed the invoices and the state court awards. The $74,517.50 in sanctions represents specific amounts awarded by the state court at discrete stages of litigation. The remaining unpaid attorney fees reflected in the invoices exceed the sanctions amounts and represent additional litigation work not fully compensated by those sanctions.

44.     To avoid duplication, the Court awards: the full $74,517.50 amount of the state court sanctions and statutory damages; and the remaining prepetition attorney fees incurred through March 2023, in the amount of $48,222.50, that were not previously satisfied by the sanctions awards. The Court expressly finds that its calculation does not duplicate amounts previously awarded by the state court.

**5. Punitive Damages**

45.     Although the Court has found that Kinser committed fraud, breached her fiduciary duties, and engaged in a sustained pattern of dishonest litigation conduct, the Court declines to award punitive damages. Under Texas law, an award of exemplary damages requires clear and convincing evidence of fraud, malice, or gross negligence. TEX. CIV. PRAC. & REM. CODE § 41.003(a). Even where that threshold is met, exemplary damages must bear a reasonable relationship to actual damages, and courts must weigh the degree of reprehensibility of the defendant's conduct, the disparity between actual harm and the punitive award, and the difference between the award and civil penalties authorized for comparable misconduct. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574–75 (1996).

46.     Here, Prasla's actual damages are already substantially augmented by the TDTPA's treble damages provision, the state court's sanctions awards, and the attorney fees to be included in the nondischargeable judgment. Those remedies have meaningfully penalized Kinser for her misconduct. Stacking a further exemplary award on top of these recoveries would result in a cumulative judgment so disproportionate to the $5,000 originally at stake as to raise serious due process concerns. The Court therefore finds that, while the record would support the requisite finding of fraud, the equities do not warrant an additional punitive award given the punitive relief already embedded in the damages determined above.

**E.  Effect of Partial Refund**

47.     Kinser argues that she refunded a portion of the funds and therefore did not misappropriate them. A partial refund made only after demand and accompanied by fabricated documentation does not negate prior fraud or fiduciary breach. The original misappropriation and subsequent concealment render the debt nondischargeable.

48.     Having determined that Kinser is liable to Prasla under Texas law and fixed the amounts of that liability, the Court turns to whether those obligations survive Kinser's bankruptcy discharge. Establishing a valid debt under state law is a necessary but not sufficient condition for nondischargeability; the debt must also fall within one of the statutory exceptions enumerated in 11 U.S.C. § 523. The Court concludes that the debt satisfies two independent exceptions — § 523(a)(2)(A) (false pretenses, false representations, and actual fraud) and § 523(a)(4) (fraud or defalcation while acting in a fiduciary capacity) — and addresses each in turn.

### F. Nondischargeability Under § 523(a)(2)(A)

49.     Section 523(a)(2)(A) excepts from discharge any debt for money, property, or services obtained by "false pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A). The Fifth Circuit has distinguished the elements of "actual fraud" from those involving "false pretenses and false representations. *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1291 (5th Cir. 1995) (overruled on other grounds by *Husky Intern. Electronics, Inc. v. Ritz*, 578 U.S. 355 (2016)). The Supreme Court also views these as distinct causes of action. *Husky*, 578 U.S. at 355, 136 S.Ct. 1581 (stating Congress "did not intend 'actual fraud' to mean the same thing as 'false representations.' ").

50.     The distinction as recognized by the Fifth Circuit appears to be a chronological one, resting upon whether a debtor's representation is made with reference to a future event as opposed to a representation regarding a past or existing fact *Bank of Louisiana v. Bercier (In re Bercier)*, 934 F.2d 689, 692 (5th Cir. 1991) (overruled on other grounds by *Husky Intern. Electronics, Inc. v. Ritz*, 578 U.S. 355 (2016)) ("In order...to be a false representation or false pretense under 523(a)(2), the false representations and false pretenses [must] encompass statements that falsely purport to depict current or past facts. [A debtor's] promise...related to [a]

22

future action [which does] not purport to depict current or past fact...therefore cannot be defined as a false representation or a false pretense").

51.     This means that "[a] debtor's representation related to a future action does not satisfy § 523(a)(2)(A) for a false pretense or false representation unless, at the time the representation was made, the creditor can establish that the debtor had no intention of fulfilling the promise or representation." *In re Rosenburg*, 2022 WL 4085886, at *3 (Bankr. N.D. Tex. Sept. 6, 2022).

52.     In this case, Kinser's conduct satisfied both the "false pretenses" or "false representation" provision in § 523(a)(2)(A), as well as the "actual fraud" provision in § 523(a)(2)(A).

53.     As to false representation: Kinser's promise at the June 19, 2014, meeting to hold and apply the $5,000 toward Faiz's future flat-fee representation was a representation of intended future conduct made with no intention of performing. The evidence compels this conclusion. Kinser immediately deposited the funds into her operating account rather than holding them in trust; she never performed any work for Faiz; she issued no contemporaneous invoices; and when her retention of the funds was challenged, she fabricated a backdated engagement agreement recasting the arrangement as hourly billing. This pattern of conduct confirms that Kinser's representations about the purpose and handling of the $5,000 were false when made.

54.     As to actual fraud, Kinser's creation and tender of fabricated, backdated documents constituted an independent scheme to deceive Prasla into believing a debt existed that would offset his refund claim. This is the sort of post-transfer concealment that the Supreme Court recognized in *Husky* as actionable actual fraud under § 523(a)(2)(A), as it was a fraudulent

23

scheme to deprive Prasla of property to which he was entitled. The debt arising from these acts is nondischargeable.

### G.  Nondischargeability Under § 523(a)(4)

55.     The debt is independently nondischargeable on a second ground. While § 523(a)(2)(A) focuses on the fraudulent nature of the representations by which the debt was obtained, § 523(a)(4) reaches a distinct wrong: the exploitation of a position of trust. The two provisions thus address different dimensions of Kinser's conduct. The former, her misrepresentations to induce payment; the latter, her misappropriation of funds she was legally obligated to hold for Prasla's benefit.

56.     Section 523(a)(4) excepts from discharge debts arising from "fraud or defalcation while acting in a fiduciary capacity." 11 U.S.C. § 523(a)(4). The concept of "fiduciary" under § 523(a)(4) is narrower than at common law: it is limited to express or technical trusts, the duties of which must arise independent of any contractual obligation and must have been imposed prior to—not by virtue of—any alleged misappropriation. *Texas Lottery Comm'n v. Tran (In re Tran)*, 151 F.3d 339, 342–43 (5th Cir. 1998); *see also EBE, Inc. v. Wilhelms (In reWilhelms)*, 2025 WL 679064, at *7, (Bankr. E.D. Tex. 2025). State law informs whether a qualifying trust relationship exists. *In re Gupta*, 394 F.3d 347, 350 (5th Cir. 2004).

57.     An attorney-client relationship satisfies the fiduciary requirement under § 523(a)(4) where the attorney holds client funds subject to a pre-existing obligation to maintain them in trust. DC Rule of Professional Conduct 1.15(e) imposed precisely such an obligation here. As a matter of professional duty, independent of any contract between the parties, Kinser was required to treat the unearned $5,000 as client property. That obligation arose at the moment she accepted unearned funds, not by virtue of any subsequent misappropriation. Kinser's

24

deliberate decision to deposit those funds into her operating account, retain them despite performing no work for Faiz, and then fabricate documents to defeat Prasla's refund demand constitutes defalcation while acting in a fiduciary capacity within the meaning of § 523(a)(4). The debt is accordingly nondischargeable on this ground as well.

### H. Nondischargeability of Costs and Post-Petition Fees

58. Finally, Prasla has requested his attorney's fees incurred post-petition in connection with this adversary proceeding as well as costs relating to his expert witness. The trial record is voluminous. And Prasla's closing arguments do not identify the amounts he is seeking or the legal basis for such an award with precision.

59. The Court, therefore, will determine the issue of costs and post-petition attorney fees in a separate motion.

### CONCLUSION

For the foregoing reasons, the Court concludes that Kinser is liable to Prasla for common law fraud, breach of fiduciary duty, violations of the TDTPA and TDCPA, and conversion under Texas law, and that the resulting debt is nondischargeable under both 11 U.S.C. § 523(a)(2)(A) and § 523(a)(4). The following amounts are determined to be nondischargeable: the unearned retainer (for Faiz's immigration matter), $5,000.00; treble damages of $15,000 under the TDTPA; the Anti-SLAPP attorney fees, $39,500, and statutory damages, $1,000, awarded by the state court; and the additional attorney fees, $34,019.50, awarded by the state court as discovery sanctions; and the balance of the attorney fees, $48,222.50, Prasla incurred prior to Kinser's bankruptcy.

The Court will determine the total award of reasonable costs and attorney fees by further order. Prasla shall have 30 days from the entry of these findings and conclusions to file a motion

for an award of his reasonable costs and post-petition fees. Kinser shall have 14 days to file an

objection, if any.

**SO ORDERED.**

Signed on 3/30/2026

*Brenda T. Rhoades* KC
HONORABLE BRENDA T. RHOADES,
CHIEF UNITED STATES BANKRUPTCY JUDGE